UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AGUILA RECORDS, INC., an Illinois Corporation, and AGUILA RAID PUBLISHING, INC., an Illinois Corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NUEVA GENERACIÓN MUSIC GROUP, INC., a Texas Corporation, MARTIN FABIAN, MARISA L. CABALLERO, RENE URBINA, CHRIS URBINA, HECTOR URBINA, ERIC URBINA, RODOLFO AVITIA, OSCAR URBINA, SR. and OSCAR URBINA, JR.,<br><br>Defendants. | No. 09 C 3399<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

**I. OVERVIEW**

Plaintiff record company, Aguila, seeks injunctive relief against Defendant band members of Alacranes Musical and their managers based on claims of trademark and copyright infringement. Plaintiffs seek to enjoin Defendants from (1) appearing and performing as, using and/or displaying the name or band logo "Alacranes Musical" in any advertisement and/or promotion of any commercial activity, including but not limited to Internet, radio and/or television appearances and/or any live performance; (2) using or displaying the name or logo "Alacranes Musical" in interstate commerce in the trade dress of any sound recording of any musical composition of the Defendants, including dissemination on Internet web pages or

sites; (3) performing and/or recording any musical composition or sound recording of which Plaintiff enjoys copyright protection, and (4) distributing any and all promotional materials, Internet publications or presence, and/or musical records/sound recording packages in trade dress marked with any such logo, depiction or mark and/or constituting a copyrighted work of Plaintiff. For the following reasons, Plaintiff's motion is granted in part and denied in part.

## II. STATEMENT OF FACTS

In 1995, Defendants Oscar Urbina, Sr. ("Oscar Sr.") and his son Oscar Jr., formed a Duranguense band, and they began playing local dances and parties using the name Alacranes Musical. Oscar Sr., made the arrangements on the bands' behalf of where and for what fee Alacranes Musical would appear. By 1998, some of the dances the band played at each month were organized and promoted by the Urbina's family friend, Pedro Avila. As part of these promotional activities, Avila organized radio interviews and programming features involving the band. In 1999 the band signed a three-record deal with Terrazas Records. From 1999 through 2001, while with Terrazas Records, the band started performing at larger venues, ranging in capacity from 1000 to 5000 attendees, opening for larger acts, and playing out of state. Jose Luis Terrazas, owner of Terrazas Records, promoted the band on local radio stations, as well as stations in Mexico, provided record stores and distributors with band posters, and arranged for distribution and sale of other band merchandise (including CDs), all in an effort to increase the group's exposure. During this time Oscar Sr. managed the band and booked the shows. The band completed the recording of three records with Terrazas, and in 2001, made a record with Dos Records, a company owned by Danny Ortiz. Avila was not involved with any of the arrangements between Alacranes Musical and the two labels.

By 2003, Avila had started his own record company, Aguila Records, and he signed Alacranes Musical to his label. On September 9, 2003, Oscars Sr. and Jr. each executed with Aguila Records an artist agreement, which explicitly stated that the signing band member is the "sole owner of all professional names" and grants Plaintiff a license to use the name. The agreement also specifies the relationship between the signing members and Aguila to be that of independent contractors. Shortly after Oscars Sr. and Jr. signed the artist agreement, Avila advised Oscar Sr. that all the other band members would need to enter into commitment contracts with Oscars Sr. and Jr., which they did on September 12, 2003. Paragraph 3 of the commitment contract states that both Oscars Sr. and Jr. are "full owners" of the "association named Alacranes Musical[.]" On September 24, 2003, Oscars Sr. and Jr. and band member Guillermo Ibarra signed an exclusive licensing agreement with Univision Records and Aguila Records.

Once the band signed with Aguila, they were on Avila's payroll. He booked the shows, negotiated the terms and fees, made the arrangements and took care of publicity. During the recording process, Avila made mixing suggestions, decided song order, paid for the recording session, and helped the band choose their wardrobe and final CD artwork photo. During the band's time with Aguila Records, several personnel changes were made. Oscar Sr. and Avila discussed and decided on the changes together. In certain instances, Oscar Jr. would audition potential band members, and an Aguila employee present at the audition would make suggestions as to who should be hired to fill the position.

On November 14, 2006, Plaintiff's trademark in the name "Alacranes Musical" was registered by the Untied States Patent & Trademark Office under registration #3,170,684. On April 29, 2008, Plaintiff's trademark in the stylized depiction of a scorpion with the name

"Alacranes Musical" was registered by the Untied States Patent & Trademark Office under registration # 3,416,668. In 2006, Plaintiff recorded and released in interstate commerce the musical composition "Por Tu Amor" on the Alacranes Musical album, *A Paso Firme*. Plaintiff obtained and registered its trademark in this musical composition and sound recording on July 20, 2007, under registration # PA0001374345. In 2007, Plaintiff recorded and released in interstate commerce the musical composition "Por Amarte Asi" on the album, *Ahora Y Siempre*. Plaintiff obtained and registered its copyright in this sound recording on August 30, 2007 under registration # SR0000610056. In 2008, Plaintiff recorded and released in interstate commerce the musical composition "Dame Tu Amor" on the album, *Tu Inspiracion*. The copyright on this musical composition and sound recording has not yet been registered.

Aguila now seeks to enjoin Defendants from using the Alacranes Musical name and logo, as well as certain songs recorded under the Aguila label. Aguila makes three alternative arguments in support of his assertion that it owns the mark Alacranes Musical. First, it holds trademark registrations for both the name and logo. Second, Aguila claims that Avila's involvement with the group and its promotion, and his influence over the style and content of the group's act make his company owner of the name and mark. Third, Aguila contends that even if the Urbinas owned the rights to the name at the time they signed with Aguila, Oscar Sr. orally and/or through his conduct assigned the rights to Aguila Records in September 2003.

### III. STANDARD OF REVIEW

A court may issue a preliminary injunction enjoining copyright or trademark infringement if four conditions are met. First, the party seeking a preliminary injunction must pass the threshold tests of demonstrating a likelihood that they will ultimately succeed on the merits of the

case and showing that irreparable harm will result if the injunction is denied. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000). To satisfy "likelihood of success," movant need demonstrate only a "greater than negligible chance of winning[.]" *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). If the movant passes those two tests, the court must then consider any irreparable harm that will result to the defendant and whether the injunction is in the public interest. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002); *Eli Lilly*, 233 F.3d at 461. Finally, the court should use a sliding scale approach to weigh all four of the factors against each other, so that the more likely that a plaintiff will succeed on the merits, the less the balance of harms needs to weigh in the plaintiff's favor. *Eli Lilly*, 233 F.3d at 461; *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

**Likelihood of success on the merits**

To prevail in a trademark infringement action, Plaintiff must establish: "(1) that it has a protectable trademark, and (2) a likelihood of confusion as to the origin of the Defendant's product." *Ty, Inc. v. Jones Group*, 237 F.3d 891, 897 (7th Cir. 2001) (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)). Defendants do not dispute that Alacranes Musical is a protectable trademark, nor do they dispute the question of the likelihood of confusion where there are two separate groups performing under the same name. They do, however, challenge Plaintiff's ownership over the mark. Because trademark registration creates a presumption of validity, it is Defendants' burden to rebut Plaintiff's claim of ownership. 15 U.S.C. § 115(a).

In support of its claim of ownership, Aguila first maintains that the mark in dispute is protected by a valid trademark registration. However, rights in a mark are acquired "through appropriation and use of the mark in commerce." *Rick v. Buchansky*, 609 F. Supp. 1522, 1531 (S.D.N.Y. 1985); 15 U.S.C. § 1065. The Urbinas maintain that they are senior users of the mark and the first to use it in commerce. Under 15 U.S.C. § 1065, a senior user's right to use the mark is preserved notwithstanding registration by a junior user. *See* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 16:18.50 (4th ed.) (West 2009). The Urbinases began performing as Alacranes Musical in 1995, and they had made four albums prior to signing with Aguila Records. During that time, they did radio promotions and sold Alacranes Musical merchandise. This is strong evidence that the Urbinas are in fact the senior users and that they will be able to rebut the presumption of ownership established by virtue of the registrations.

Second, Aguila maintains that it is the lawful owner of the marks by right, since Avila exerted influence over certain aspects of the group's act and image. In support of its argument, Aguila relies on *Rick v. Buchansky*, 609 F. Supp. 1522 (S.D.N.Y. 1985). However, in that case, the plaintiff-manager literally discovered the defendant-musicians on a street corner and invented the final version of their band name which they adopted after signing the management agreement. The group in question in that case "was formed at [the plaintiff's] instigation." *Id.* at 1532. This is not the case here. The band was formed and the name adopted long before the group signed with Aguila. Although prior to signing, Avila booked the band to play at several of his dances and promoted Alacranes Musical in connection with these performances, this participation does not rise to the level of the influence exerted by the manager in *Rick*. Plaintiff also posits that

after signing, Avila did in fact exert the requisite influence over the group's content and style to be trademark owner.  It is true that Avila did, during that time, pay Defendants a weekly salary, cover their expenses, book the gigs, make recording suggestions, and order the songs on the CDs; however, at the time this occurred, the evidence suggests that Alacranes Musical had already appropriated its name and used it in commerce.  Unlike in *Rick*, there seems to be, at this point, little question of who owned the name when the band signed with Aguila.  Assuming that Defendants were indeed the senior users, Plaintiff could only acquire ownership over the mark by assignment.

Plaintiffs claim that to the extent Defendants ever did own trademark rights in Alacranes Musical, they assigned those rights to Plaintiff when the band was "transferred" along with the name, to Plaintiff.  Plaintiff presents no clear evidence of assignment or transfer of ownership but rather maintains that the agreements are, at best, in conflict with regard to the ownership rights.  Oscars Sr. and Jr. each signed an artist agreement declaring that each was the "sole owner" of all professional names, thereby creating two "sole owners," which Plaintiff maintains is a contradiction in terms.  Paragraph 3 of the commitment contract states that both Oscars Sr. and Jr. are "full owners" of the "association named Alacranes Musical," which conflicts with the sole ownership articulated in the artist agreement.  Finally, the Univision agreement may be read to say that the three signers, Oscars Sr. and Jr., as well as Ibarra, are together the "sole owner" of the name Alacranes Musical.  Although none of these contracts is ambiguous on its face, when read together, they demonstrate an ambiguity as to ownership of the name.  Plaintiffs assert that because of this ambiguity, I should consider parol evidence in order to determine the parties' intentions.

Under Illinois law, the artist agreements, seemingly part of the same transaction of signing the band, should be read together.[1] *See Pecora v. Szabo*, 418 N.E.2d 431, 436 (Ill. App. 1981) ("where different instruments are executed together as part of one transaction or agreement, they are to be read together and construed as constituting but a single instrument."); *Acequia, Inc. v. Prudential Ins. Co. of America,* 226 F.3d 798, 803 (7th Cir. 2000) (noting the "unexceptionable rule of contract interpretation" that "related documents must be read together" and that this rule may be applied before a court analyzes whether there exists a contractual ambiguity.). When read together, the two agreements are contradictory, since two individuals cannot both be the "sole owner" of the mark. Because of this contradiction, I may look to parol evidence to ascertain the parties' intent. *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991). However, the parol evidence put forth thus far does not suggest an assignment of ownership.

Plaintiff points to the conduct surrounding and following the signing of the band, which it considers to signify a "radical transformation" in the relationship between Avila and the group. According to Plaintiff, the band members became employees of Aguila, and both parties agree that Aguila bore the financial risks associated with performances and album production. However, this conduct does not suggest a transfer of ownership of the band or the trademark rights, and Plaintiff provides no expert testimony in support of its argument that it does. Plaintiff

---

[1] Although it is clear that the artist agreements should be read together, the same cannot be said for the proposition that all of the contracts - the artist agreements, commitment agreements, and Univision agreement - should be read together since they are not necessarily part of one transaction or agreement. For this reason, I address only the contradiction posed by the two artist agreements, which is sufficient for the purposes of considering Plaintiff's argument that parol evidence should be introduced here.

8

also relies Oscar Sr.'s testimony that "I gave [Avila] my group, cleanly." But the meaning of this statement is far from clear, especially in light of credible accompanying testimony that Oscar Sr. and Avila never discussed transferring ownership of the group or its name, and that the name was sacred to the band. It is just as likely that Oscar Sr.'s statement refers to turning the group over to Avila for management, not ownership purposes. There is little evidence of any meeting of the minds with regard to any transfer of ownership or assignment of rights in the name. For these reasons, there is a substantial chance that Plaintiff will lose on the merits of its claim with regard to the name Alacranes Musical.

Furthermore, Plaintiff is unlikely to succeed on its claim relating to the logo. The scorpion logo first appeared on the album *Puro Tamborazo*, the record the group made with Dos Records. Avila testified to his understanding that when he purchased the master from Ortiz, he was also purchasing the artwork. However, there is little documentation to support this claim. In fact, the original contract between Ortiz and Oscar Sr. memorializes a sale to Ortiz of "one hundred percent (100%) of all of the rights, interests and title to, and in, the Master recording of [*Puro Tamborazo*]." The agreement makes no mention of artwork or trademark, and there is little evidence to suggest that Ortiz possessed any rights to the logo in the first place. Without such ownership, Dos had no rights in the name to transfer to Aguila.

**Irreparable Harm and the Balance of Harms**

At the heart of this dispute is the Defendants' ability to continue performing and recording under the name Alacranes Musical. Notwithstanding the harm to Plaintiff, it is the irreparable harm to Defendants if the injunction is issued that tips the balance against its issuance. Were I to enjoin Defendants from using the name Alacranes Musical, they would face

two options.  First, they could negotiate with Aguila to continue working under the label.  If such an agreement came to fruition, Defendants would be in business with a promoter who no longer trusts them, most likely resulting in a loss of momentum in a field where any semblance of long-running success depends on it.  This could potentially injure both Aguila and Defendants equally.  Or, alternatively, Defendants could part ways with Aguila and surrender the name.  But it is undisputed that the name of the band is intertwined with its success.  As evidenced by the many personnel changes that have taken place over the years, fans are drawn to the ensemble that is Alacranes Musical and not to any specific performers.  This option would certainly cause irreparable harm to Defendants, and if it turns out that the injunction was granted in error, it is difficult to see how, after the disruption imposed by the injunction, Defendants could regain the popularity they currently enjoy.

However, were I not to grant the injunction, Defendant band members will continue to perform as Alacranes Musical, promoted by Defendant promoters, the abilities of whom are not in dispute.  They will most likely continue to grow in popularity and earn income as a result.  It is true that Avila will no longer be the exclusive purveyor of Alacranes Musical.  As such, Avila may be required to start from square one, building another brand and reputation.  Due to the fleeting nature of popularity, such a task may prove to be unsuccessful, and Avila would have lost out on the band's current notoriety.  *See Tom Doherty Associates Inc. v. Saban Entertainment Inc.*, 869 F. Supp. 1130, 1135 (S.D.N.Y. 1994) ("The loss of the opportunity to distribute and market a commodity may constitute irreparable harm.") (citation omitted)).  However, if my denial of the injunction is found to be erroneous, the harm to Aguila is not irreparable, and Alacranes Musical could surely compensate Aguila financially, in the amount of what Aguila would have made had it continued to promote the band.  The band name would then

be "returned" to Aguila, with the momentum intact, and Aguila would essentially be in the same position it would have been had the injunction been granted.[2] The balance of harms weighs against granting the injunction with regard to the use of the name Alacranes Musical.

Moreover, because Plaintiff is paid royalties for public performances of the songs in which it holds copyrights, there is little if any harm to Plaintiff in denying their request for relief as to the compositions. Defendants have removed the songs at issue from the website, eliminating any harm from such usage.

**Scope of Preliminary Injunction**

Although Plaintiff does not demonstrate a strong likelihood of success on the merits of its claim, it does demonstrate a "greater than negligible chance of winning," especially in light of its registrations of the name and logo for use on prerecorded compact disks, audio and video disks and cassettes as well as on any merchandise including T-shirts, hats, jackets and shirts. *AM General Corp.*, 311 F.3d at 804. The registrations, along with the presumption of validity that accompanies them, does provide for a stronger likelihood of success. However, the registrations do not cover usage of the name for the purposes of live performance, and where Plaintiff does not have registration, its case, while not fundamentally flawed, is distinctly weaker. For this reason, Plaintiff's motion with regard to Defendants' use of the name and mark on prerecorded compact disks, audio and video disks and cassettes as well as on any merchandise including T-shirts, hats, jackets and shirts is granted, and denied as to the remaining relief sought.

---

[2] In fact, Aguila may end up in a better position, if Nueva Generacion is successful in its efforts. Depending on the size and capabilities of Nueva Generacion, the band may have access to larger venues and audiences than it would have with Aguila, thereby bolstering its popularity and resulting in a more advantageous position for Aguila if the injunction is improperly denied.

Plaintiff argues that once it has established a protectable interest in a mark, it need not demonstrate that "defendant[s'] allegedly confusing use involves the *same* goods or services listed in the registration[,]" and that any relief granted should extend to any use of the mark that will result in confusion, regardless of whether that use is covered by registration. *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 972-73 (9th Cir. 2007) ("In sum, a plaintiff trademark owner must establish a valid, protectable interest in order to proceed to the second prong of the trademark infringement analysis-the likelihood of confusion resulting from the defendant's alleged infringing use.") (emphasis in original). Plaintiff claims that under *Applied Info. Scis.,* "[w]hether [Defendant's] use of [the mark] infringed [Plaintiff's] protected interest then becomes a question of likelihood of confusion." *Id.*

This may be true at the permanent injunction stage, once Plaintiff has in fact established a protectable interest in a mark, however this is not the case at this time. As discussed *supra*, there is a substantial chance that Plaintiff will lose on the merits, even on the marks themselves. For this reason, I need not advance to the likelihood of confusion analysis that is the second prong of the trademark infringement inquiry. It is certainly worth noting that there is no dispute as to the likelihood of confusion in this case, but relief at this stage is not based solely on the likelihood of confusion, but also on the other factors to be weighed in granting a preliminary injunction - irreparable harms and the balance of harms. When those two factors are considered together with the likelihood of success on the merits, there is little support for issuing a preliminary injunction against Defendants' use of the name in live performance. However, under the sliding scale approach, because Plaintiff has a slightly higher chance of success on the merits where it holds registrations, preliminary injunction is warranted even where the balance of harms does not weigh in Plaintiff's favor.

## IV. CONCLUSION

Because Plaintiff has demonstrated a greater-than-negligible chance of success on the merits on claims involving registrations, I am enjoining Defendants from using the registered materials for the purposes specified in the registrations, namely on prerecorded compact disks, audio and video disks and cassettes as well as on any merchandise including T-shirts, hats, jackets and shirts. Because Plaintiff has demonstrated a lesser chance of success on the merits on claims not involving registration, and because the balance of harms tips in Defendants' favor, Plaintiff's motion to enjoin Defendants from using the name for live performances is denied. Finally, because there is no resulting harm to Plaintiff, its motion to enjoin Defendants from performing copyrighted songs is denied.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: November 4, 2009